**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | | |
|---|---|---|---|
| In re | **W. DRAYSON SILVERA, II,** | : | **Chapter 7** |
| | | : | |
| | **Debtor** | : | **Bky. No. 21-12213 ELF** |
| | | : | |

# O P I N I O N

W. Drayson Silvera ("the Debtor") filed an individual voluntary petition under chapter 7

of the Bankruptcy Code in this court to obtain a respite from substantial financial distress caused

by difficulties in the Debtor's small business, the source of his livelihood.  In order to pay his

and his family's living expenses, the Debtor amassed significant credit card debt.  He also

obtained forbearance on his home mortgage loan for his residence, 200 McKinley Street, Bristol,

Pennsylvania ("the Residence").[1]

The Debtor believed that filing this bankruptcy case could provide him with breathing

room to resolve his residential mortgage problem and relieve him of the substantial unsecured

debt that he had accumulated.  In other words, the Debtor hoped for and expected that

bankruptcy would provide him with the proverbial "fresh start."

The bankruptcy case has not gone as planned.

At the outset, the Debtor's bankruptcy schedules and statement of financial affairs, filed

after obtaining an extension of time from the court, were not accurate. Most prominently, the

Debtor did not disclose the existence of the Residence. After the Debtor amended the schedules

---

[1]     The property is also known by the address of 2100 E. Farragut Avenue.  In one of the Debtor's
filings, he identified the address as 260 McKinley Street, not 200 McKinley Street, but there is no dispute
that only one (1) property is involved in this case.

to include his ownership of his residence, it became obvious that the property had equity well beyond the limit of the Debtor's bankruptcy exemption.  See 11 U.S.C. §522(d)(1).

In December 2021, Robert Holber, the chapter 7 trustee ("the Trustee") filed a notice converting the case from a "no-asset" to "asset" case.  Ultimately, the Trustee determined that it would be appropriate to administer (i.e., sell), the Debtor's residence and certain business assets owned and used by the Debtor in operating his small business, assets that are essential to continued operation of the business.

On January 18, 2022, the Debtor filed a motion to voluntarily dismiss the case ("the Motion") asserting that his bankruptcy filing was a mistake. (Doc. No. 59). The Trustee opposes the Motion. (Doc. No. 64).  He asserts that the Debtor has not met his statutory burden of establishing "cause" for dismissal under 11 U.S.C. §707(a).

On March 10, 2022, I held a hearing on the Motion by video conference.  The parties presented testimony and argument. On March 15, 2022, at the court's request, the Trustee filed a statement describing the course of case administration he intends to undertake if the Motion is denied.  (Doc. No. 83) ("The Trustee's Statement").

In In re Jabarin, 395 B.R. 330 (Bankr. E.D. Pa. 2008), I set out the legal principles governing a chapter 7 debtor's request to voluntarily dismiss a bankruptcy case over the objection of the chapter 7 trustee.  In a nutshell, the court must engage in a fact-sensitive inquiry that is guided by equitable considerations, balancing the benefit and harm to the creditor body and the debtor alike.  Id. at 339.

After considering the circumstances which caused the Debtor to file this ill-fated chapter 7 case, and after weighing the impact that dismissal would have on creditors against the impact further case administration would have on the Debtor, in the exercise of my equitable discretion,

2

in what I must describe as a very close call, I find that the Debtor has met his burden of

establishing cause under §707(a).

I will grant the Motion and dismiss this chapter 7 bankruptcy case.

# I.  FACTS

Based on the evidentiary record, I make the following findings of fact:

**The Debtor**

1.  The Debtor is a middle-aged man, currently living with his wife of twenty (20) years and
    two (2) of his four (4) children. (Audio 1:02 - 1:04).[2]

2.  Nearly twenty-four (24) years ago, the Debtor began working as a tractor trailer driver
    after his wife became pregnant with their first child. (Audio 1:04 – 1:05).

3.  In 2010, the Debtor started his own trucking business for which he is hired to move and
    deliver large product on trucks, such as flatbeds.  He named the business "Nevakwit,
    Moving Deliveries, LLC" ("Nevakwit"). (Audio 1:04 – 1:05).

4.  Approximately two years later after starting Nevakwit, in November 2012, the Debtor
    purchased his first flatbed tractor for the business – a 2007 Manac – 48i Flatbed Trailer.
    This acquisition enabled him to "pull" or haul his first delivery in 2013. (1:05-.

5.  For the next few years, from approximately 2013/14 through 2017, the Debtor continued
    to build Nevakwit, but also maintained a part-time truck driving job for another company
    three (3) days per week. (Audio 1:05 – 1:08).

---

[2]      The hearing held on March 10, 2022 was not transcribed.  My citations are to the times on the
unofficial audio recording of the hearing.

6.   The Debtor ultimately left the part-time job because he believed that it would be more profitable to operate Nevakwit full time.  (Audio 1:08 – 1:09).

7.   In 2017, the Debtor purchased the Residence.  (Audio 1:06).

8.   At the time he purchased the Residence, he believed it was titled in both his name and his wife's name. (Audio 23:48).

9.   Starting in late 2018, Nevakwit began to suffer financially. (Audio 12:25).  The costs and maintenance associated with the operation of the flatbed became problematic, so the Debtor purchased a second vehicle for Nevakwit — a 1996 Trackmobile 53' Trailer. (Audio 1:10 – 1:12).

10.  During this time Nevakwit was financially suffering, the Debtor continued to remain current on his mortgage payments and bills but became concerned about becoming late in his payments.  (Audio 1:10).

11.  In June 2020, approximately three (3) months into the Covid-19 pandemic, the Debtor voluntarily entered into a forbearance agreement with his mortgage company, despite being current on the payments at the time.  Having declined this option twice before, he ultimately chose this route because his business had continued to decline. He believed the financial breathing room a forbearance afforded might provide him with the ability to invest more resources in Nevakwit and continue to support his family. (Audio 13:00; 53:00, 1:12 – 1:16, 1:28).

12.  The Debtor did not know that his wife was not on the deed to the Residence. He would not have filed for bankruptcy had he known she was not on the deed. (Audio 24:00).

4

**Bankruptcy Filings and Schedules**

13. On August 11, 2021, the Debtor filed this voluntary individual chapter 7 bankruptcy

case.[3]

14. In his original Schedules A/B – E/F, filed on September 8, 2021, the Debtor disclosed

that he had:

      a.   no real property;

      b.   six (6) automobiles he solely owned with a total value of $11,134.00, which he
claimed as entirely exempt on Schedule C;

      c.   one (1) secured creditor, Nationstar/Mr. Cooper, (i.e., the mortgage holder on the
Residence) with a total claim of $218,376.00, but whose collateral was valued at
$182,000.00;

      d.   nonpriority unsecured debt consisting mostly of credit cards and outstanding
utility bills totaling $29,288.10;

      e.   a total monthly income of $3,971.00;[4] and

      f.   monthly expenses totaling $3,905.00, which included a monthly mortgage
payment of $1,960.00;

(Tr. Ex-2).

15. On October 12, 2021, the Debtor filed amended schedules.  In Amended Schedule A/B,

the Debtor disclosed his ownership of the Residence,[5] with a current value of

$328,000.00.  (Doc. #'s 28, 32).

---

[3]     The 341(a) meeting was first scheduled for August 31, 2021 but has been continued multiple
times and remains in abeyance pending the outcome of this matter.

[4]     At the time he filed the petition, he had been working as a truckdriver for his business, Nevakwit,
for seven (7) years earning $1,219.00 per month while his non-debtor wife began working as a Teacher's
Aid five (5) months prior to the petition filing and was earning $2,752.00 per month.

[5]     The address of the Residence was incorrect on the amended schedules. The schedules use 260
McKinley instead of 200 McKinley. (Doc. No. 32).

16. The Debtor based the increase of value for the Residence (from $182,000.00 in his initial

Schedule D to the $328,000.00 listed in Amended Schedule A/B) on information

provided to him by the Trustee after the Trustee sent a realtor to the Residence. (Audio

45:47).

17. In Amended Schedule A/B filed on October 12, 2021, the Debtor also disclosed in Part

5, ¶ 40, three (3) additional tractor trailer vehicles used by Nevakwit with a total value of

$12,000; this included the 2007 Manac and the 1996 Trackmobile. (Tr. Ex-1).[6]

18. The total value for all nine (9) vehicles ("the Vehicles") is approximately $23,134.00.

19. On December 14, 2021, the Trustee filed a notice re-designating the case from a no-asset

case to an asset case. (Doc. No. 48).  The same day, the Trustee filed an application to

employ Star Real Estate Group to assist the Trustee in marketing and selling the

residence of the Debtor.  (Doc. No. 49).

---

[6]      Although not raised by the parties, it appears that all pages of original Schedules A-F were filed
on September 8, 2021, but on Schedule A/B, Part 5: item numbers 38-45 are missing. This includes ¶ 40,
which requires disclosure of "Machinery, fixtures, equipment, supplies" used in business.  These three (3)
additional vehicles also were not included under the Debtor's original exemptions on Schedule C.
However, the Debtor amended Schedule C and exempted all nine vehicles as follows:

| | |
|---|---|
| 2003 Honda Accord - | $1,094 |
| 2003 Ford Windstar - | $1,102 |
| 2005 Ford Mustang - | $3,221 |
| 2022 Suzuki 1300 - | $3,495 |
| 2002 Ford Explorer - | $  522 |
| 1989 Ford F350 - | $1,700 |
| 2006 Kenworth Tractor - | $8,000 |
| 1996 Trackmobile 53' Trailer - | $3,000 |
| 2007 Manac  - 48i Flatbed Trailer | |
| (not roadworthy) - | $1,000 |

 (Doc. Nos. 29, 37).

20. On December 27, 2021 the court entered an order authorizing the Trustee to employ Star

    Real Estate Group to market and sell the Residence. (Doc. No. 52).

21. As of the hearing on the Motion, various creditors filed eleven (11) proofs of claim,

    asserting unsecured claims totaling slightly in excess of $50,000.00.[7]


### The Debtor's Assets and Projected Income

22. The Debtor believes that Nevakwit's profitability has improved and that the value in the

    Debtor's home dramatically increased since the filing of the bankruptcy petition. (Audio

    1:18).

23. The Debtor projects that he will generate approximately $3,000.00/$3,500.00 week

    (before expenses) in the six (6) months from the date of the hearing (April – October

    2022), presuming his equipment maintains its integrity. From that net income, he predicts

    he will clear $1200.00 - $1500.00/week before taxes. Id.

24. The Debtor also anticipates his wife will take home roughly $2,000.00 per month after

    taxes. She continues to earn $20.00/hr. at 35 hours/week, which will gross approximately

    $700.00/week; roughly $3,000.00/month. (Audio 1:22).

---

[7]    Quite possibly, if the case is administered as an asset case, the allowed unsecured claims will be considerably less than the filed claims. The Trustee acknowledged at the hearing that a number of the filed claims likely are stale and that (prior to the filing of the IRS claim) the Debtor's unsecured debt is closer to approximately $29,000.00, which is what the Debtor reported in his schedules.

    Apart from the general unsecured claims, two (2) creditors filed claims secured by the residence for unpaid taxes and water bills. The two (2) claims total approximately $3,500.00.

    Also, there is one (1) priority tax claim, filed by the Pennsylvania Department of Revenue, in the amount of $1,2317.17. After the hearing on the Motion, the U.S., Internal Revenue Service filed a proof of claim, asserting a priority claim of $1,305.46 and a general unsecured claim of $8,941.46.

25. The Debtor currently possesses only two (2) of the three (3) trailers he previously owned. He sold the "not roadworthy" Manac Flatbed for $800, one month prior to the March 10, 2022 hearing. He believed he could use proceeds for fuel for the other vehicles, but retained the proceeds as of the hearing. (Audio 49:30 – 49:50).

26. The 1996 Trailer is in the repair shop and the 2006 Kenworth is functional and operating. (Audio at 51:00 - 52:00).

27. The Honda Accord is exclusively used by the Debtor's daughter.[8] (Audio 47:50).

## II.  THE TRUSTEE'S PROPOSED ADMINISTRATION OF ASSETS

As stated earlier, on March 15, 2022, the Trustee filed the Statement.

Presuming the Residence sells for $310,000.00 less $31,000.00 in sale costs, the Trustee projects that the sale will yield $33,127.00 for the estate after satisfying the existing mortgage. If the Debtor asserts his potential bankruptcy exemption under 11 U.S.C. §522(d)(1), the Trustee estimates that the estate will net $7,977.00.[9]  The Trustee points out that the sale of the house also will satisfy the two (2) secured claims filed in this case.  See n.7, supra.

---

[8]      In the schedules, the Debtor listed two (2) values for the vehicle.  A total value of $1,094.00 and a value of $547.00 for the Debtor's portion.  The Debtor explained that he listed his value as one-half because his daughter is the principal driver/user.  Of course, there is no basis for valuing the vehicle in the manner described by the Debtor.

[9]      Below is the Trustee's calculation:

    $ 310,000.00   (sale price of house)
    ($  31,000.00)   (costs of sale)
    ($ 245,873.00)   (mortgage pay off)
    $    33,127.00   net before Debtor's exemption
    $     25,150.00  (Debtor's §522(d(1) exemption)
    **$     7,977.00   net after Debtor's exemption**

The Debtor appears to have attempted to claim the §522(d)(1) exemption.  (See Amended Schedule C) (Doc. # 37).  However, the amount of the claimed exemption in the Debtor's filing is blank.

Case 21-12213-elf    Doc 100    Filed 07/14/22    Entered 07/14/22 16:18:15    Desc Main
Document      Page 9 of 19

As for the vehicles, using their values as listed on the schedules and including the

$800.00 the Debtor recently received from the sale of the non-working flatbed, the Trustee

believes that the estate can net $16,720.60.[10]

Thus, the Trustee's projection is that the liquidation of the Residence and all the vehicles

will net an estimated $24,697.60. The Trustee estimates that administrative expenses could be as

high as $19,000.00,[11] but he will discount his commission by 50% ($9,500.00) to provide a

meaningful distribution to creditors.  Therefore, the Trustee estimates there will be an

approximately $15,197.60 left for creditors.

When he filed his Statement, the Trustee calculated that, after payment of the then-

existing priority claim (of the Pennsylvania Department of Revenue, see n.7, supra), unsecured

claimants would receive a 27% distribution, based on the $52,449.21 in filed claims listed on the

Claims Register.

---

[10]    Below is the Trustee's calculation:

| | |
|---|---|
| $ 22,134.00 | (sale of eight (8) vehicles) |
| $    800.00 | (cash received from sale of flatbed) |
| ($ 2,213.40) | (liquidation expenses) |
| ($ 4,000.00) | (vehicle exemption) |
| **$ 16,720.60** | **net to the estate** |

The Trustee's reduction of $4,000.00 for the Debtor's exemption is based on the Debtor's claim
of the exemption under 11 U.S.C. §522(d)(2). However, the Debtor may be entitled to an additional
exemption of $2,525.00 under 11 U.S.C. §522(d)(6). See  In re Giles, 340 B.R. 543 (Bankr. E.D. Pa.
2006).

[11]    The Trustee does not say so explicitly, but I assume that he calculates his statutory commission
based on the entire sale price of the Residence, including the more than $245,000.00 payable to the
mortgagee.

There is a second scenario taking into account the subsequently filed IRS priority claim (which was unknown to the Trustee when he filed the Statement) and the likelihood (acknowledged by the Trustee) that allowed unsecured claims would be $29,000.00 in the aggregate.  Under this scenario, the IRS priority claim (like the Pennsylvania Department of Revenue priority claim) would be paid in full, leaving $3,713.51 for unsecured creditors, a 12.8% distribution.[12]

## III.  LEGAL PRINCIPLES: §11 U.S.C. §707(a)

Section 707(a) of the Bankruptcy Code provides that the court may dismiss a chapter 7 case "only after notice and a hearing and only for cause. ..." 11 U.S.C. §707(a). Although the Code does not expressly address whether §707(a) applies to a debtor seeking voluntary dismissal of his own petition, "courts have found that chapter 7 debtors may move for voluntary dismissal under this section." In re Hopkins, 261 B.R. 822, 823 (Bankr. E.D. Pa. 2001); see also In re Smith, 507 F.3d 64, 72 (2d Cir. 2007); In re Turpen, 244 B.R. 431, 434 (8th Cir. B.A.P. 2000); In re Watkins, 229 B.R. 907, 908-09 (Bankr. N.D. Ill. 1999). Thus, courts frequently observe that while a chapter 7 debtor may choose to place himself or herself in bankruptcy voluntarily, the debtor does not enjoy the same freedom to withdraw the bankruptcy case as of right once it has been commenced. See, e.g., In re Boyce, 2006 WL 3061633, at *3 (E.D. Pa. Oct.26, 2006); In re

---

[12]

|  |  |
|---|---|
| $15,197.60 | estate funds after trustee commission |
| ($11,493.99) | sum of Pennsylvania Department of Revenue and IRS priority claims |
| $ 3,713.51 | available for general unsecured creditors |

Based on $29,000.00 of allowed unsecured claims, this would result in a 12.8% distribution to general unsecured creditors.

Strunk, 2008 WL 1994848, at *1 n. 4 (Bankr. E.D. Pa. May 8, 2008); In re Aupperle, 352 B.R.

43, 45 (Bankr. D.N.J. 2005).

To dismiss a chapter 7 case voluntarily, "the debtor has the burden of demonstrating

sufficient cause." In re Boyce, 2006 WL 3061633, at *3; accord In re Cohara, 324 B.R. 24, 27–

29 (6th Cir. B.A.P. 2005); In re Turpen, 244 B.R. at 434. Determining whether sufficient cause

exists is committed to the sound discretion of the bankruptcy court. Boyce, 2006 WL 3061633, at

*4; In re Heatley, 51 B.R. 518, 519 (Bankr. E.D. Pa. 1985).

In Jabarin, I engaged in lengthy discussion of the concept of "cause," undefined in 11

U.S.C. §707(a). I described three (3) lines of cases that I perceive as essentially falling along a

continuum where, on one end, dismissal is not appropriate if there is *any* prejudice to creditors

and on the other end dismissal is warranted unless the court concludes "plain legal prejudice" to

creditors would result — this being most hospitable standard for debtors. I subscribed to the

third approach that falls in between these two extremes, "balancing of interests," requiring an

evaluation of the best interests of the debtor and the creditors of the estate, with some emphasis

on whether the dismissal would be prejudicial to creditors. I found this "balancing of interests"

approach affords bankruptcy courts the flexibility needed to make the equitable determination

whether there is "cause" for a voluntary dismissal under §707(a). Id. at 337-339.

In the end, I articulated a standard under §707(a) in which the court will engage in "a

factually intensive assessment of the debtor's reasons for dismissal and of the impact dismissal

can be expected to have on the creditors." 395 B.R. 330, 339. I suggested that two (2) inquiries

tend to predominate in the court's inquiry: (1) has the debtor acted in good faith, and (2) the

degree to which creditors will be prejudiced by dismissal.[13]

---

[13]    How one evaluates prejudice to the creditors may depend on how one answers various questions,
such as:

Finally, in <u>Jabarin</u>, I emphasized that determining whether "cause" for dismissal under §707(a) exists cannot be determined by a mechanical application of abstract legal principles; rather, the issue "should be resolved on a case-by-case basis in the context of the specific facts presented." <u>Id.</u> at 341.

## IV.  DISCUSSION

### The Debtor Acted in Good Faith

The Debtor testified that when he first filed the case, he genuinely believed a bankruptcy would be in his best interests.  He needed to "catch his breath" after attempting to keep his head above water on his own.  He leveraged his credit cards to maintain personal and family life expenses while Nevakwit was experiencing economic hardship.  He later entered into a mortgage forbearance agreement.  He subsequently fell behind on his credit card bills and taxes.

This sequence of events is not uncommon. Debtors often do whatever they can to scrape together and cross-leverage resources to maintain their basic living expenses before filing a bankruptcy case.  It also is common that these efforts are unsuccessful.  I infer that the Debtor acted out of desperation during some of the most uncertain of times in recent history — the beginning of the Covid-19 pandemic. Plus, there is no evidence that the Debtor engaged in any

---

Can the mere pendency of a bankruptcy case (before its dismissal) and concurrent pendency of the automatic stay, without more, be considered inherently "prejudicial" to creditors and, as such, grounds for denying a voluntary motion to dismiss?  If so, how long must a case be pending before the resulting delay in seeking nonbankruptcy-related remedies is prejudicial? What weight, if any, should be given to a debtor's proposed plan for voluntarily paying creditors outside of bankruptcy?  May the loss of a motivated fiduciary (i.e., the chapter 7 trustee) and a single forum for all creditors be considered "prejudice"?

<u>Jabarin,</u> 395 B.R. at 340–41.

improper prepetition asset transfers.  Therefore, I find nothing in the Debtor's pre-petition conduct that suggests a lack of good faith.

By comparison, his actions in the bankruptcy case itself are a bit problematic.

To begin, I question the quality of the initial consultation provided to the Debtor by counsel around filing bankruptcy and, specifically under chapter 7.  I infer that counsel did not provide the Debtor with a comprehensive understanding regarding the impact of a bankruptcy case, including the potential impact on the Debtor's forbearance agreement with his mortgage servicer.  Most significantly, it appears that little thought, discussion or investigation went into the valuation and exemption issues with respect to the Debtor's residence  -- these issues usually being the top priority for most persons who are considering filing a chapter 7 bankruptcy case.

Additionally, the schedules initially filed were not accurate or complete.  Most significantly, Schedule A/B failed to disclose the Residence.  The Debtor explained the reason for this omission was his belief he only needed to list assets he solely owned; he was under the mistaken belief that the Residence was titled in both his name and his wife's name.  It is hard to understand the source of this idea, particularly since the Debtor had counsel assisting him in preparing the schedules. This is troubling. However, I attribute this nondisclosure to the failings of the Debtor's counsel, rather than the Debtor.

The Debtor's counsel stated during the hearing that he believed that disclosure of the Residence was omitted due to a software glitch.  Of course this is possible, but why didn't he notice the error?  One would hope that he reviewed the schedules with the Debtor before the Debtor signed (electronically or by wet signature) and authorized them to be filed.

I consider it more likely that counsel, not the Debtor, is responsible for the nondisclosure. Counsel either failed to properly advise the Debtor regarding the scope of the required

13

disclosures of his assets or exhibited an inexcusable inattentiveness to the content of the prepared schedules before filing them.

In this regard, counsel's ineffectiveness also was manifested by his admission that he did not run a property search before filing the bankruptcy case and that, instead, he relied entirely on the Debtor's understanding regarding the state of his title to the Residence. (Audio 8:10-35). Had counsel taken the simple (and from a minimal standard of practice perspective – obligatory!) step of obtaining a property search, he would have seen that the Debtor is the sole owner of the Residence and its proper disclosure in the schedules would have been a non-issue.  It is hard to conceive how an attorney can competently evaluate the propriety of filing a bankruptcy case on behalf of an individual who owns real property without first examining the contents of a property search.

The effect of counsel's failure to obtain a property search had an additional ripple effects.

On October 12, 2021, counsel filed an Amended Schedule A/B that disclosed the Debtor's ownership of the Residence, thus correcting the initial disclosure stating that the Debtor owned no real property.  (Ex. T-3).  But, the Amended Schedule A/B disclosed the Debtor as a joint owner of the Residence and was accompanied by an Amended Schedule C that claimed the property as exempt based on the tenancy by the entireties exemption in §522(b)(3)(B)  --  an obvious invalid claim of exemption since, in fact, the Debtor is the sole owner of the Residence.[14]

---

[14]     Subsequently, on November 9, 2021, counsel filed another Amended Schedule C, this time claiming the Residence as exempt under 11 U.S.C. §522(d)(1).  (Doc. # 37).  But in this filing, counsel made still another error.  He claimed exemptions under both 11 U.S.C. §522(b)(2) and (b)(3).  This is not permitted.  See  11 U.S.C. §522(b)(1) (exemptions may be claimed under §522(b)(2) "or" (b)(3) and in a joint case, the parties must choose the same exemption scheme).

These errors described above were exacerbated by counsel's failure to investigate the current value of the Residence at the time of the projected chapter 7 filing.  It is unclear whether counsel ever contemplated how changes in the real estate market might affect the Debtor's equity in the Residence and the potential for the chapter 7 trustee to seek to sell the Residence.  This is another, inexplicable, material failing on counsel's part considering that, at the time the Debtor commenced this case, it was well known in the bankruptcy community (and the public at large) that real estate generally was appreciating in value dramatically.

In essence, the existence of this contested matter is a product of multiple mistakes by counsel --  errors that should not happen.

In evaluating the Debtor's good faith, aside from considering the inexcusable quality of counsel's representation, I also find it significant that in his initial Schedule D, the Debtor disclosed the existence of a creditor secured by a mortgage, even though he listed no real property in Schedule A/B.  The Schedule D disclosure was an obvious clue that real estate was involved in this bankruptcy case.  The Debtor would not have made this disclosure if he were attempting to hide this asset.

Based on this record, I do not perceive any specific intent by the Debtor to conceal his ownership of the Residence.

In evaluating the Debtor's good faith in filing the bankruptcy case, I also consider his reasons for filing the case.  As explained earlier, those reasons were conventional.  He hoped to retain the Residence while discharging unsecured debt.  He would not have filed the case if he thought his retention of his home was at risk.  (Audio 24:20).

Based on all of the circumstances described above, while there are some red flags in this case, I nevertheless find that the Debtor has acted in good faith.

15

**Balancing the Harms to the Debtor Against the Harm to the Creditors**

Under 11 U.S.C. §707(a), I must make an equitable determination in which I balance the harm to the Debtor if I permit this ill-advised bankruptcy case to continue against the harm to the creditors if I dismiss the case, as the Debtor requests.

There is no doubt in this case that there is some palpable harm to the creditors if I dismiss the case.  The Trustee has properly and professionally pressed for the right to administer non-exempt assets that will likely result in a distribution that should satisfy priority claims in full and has the potential to provide a sufficient distribution to unsecured creditors to warrant administration of this case as an asset case.

In the last sentence in the paragraph above, I use the phrase "has the potential" with respect to the projected distribution to general unsecured creditors because I am less certain than the Trustee regarding the magnitude of the likely distribution (and benefit) to unsecured creditors. I suspect that the vehicles may not bring in the revenue the Trustee projects and that their associated sale expenses may exceed the Trustee's estimate.  Thus, I would not be surprised if case administration resulted only in the full or almost full payment of the priority claims with little or no distribution to general unsecured creditors.  This is not a criticism of the Trustee.  Nor is it intended to suggest that the Trustee's proposed course is anything less than proper, with a completely legitimate bankruptcy purpose.  Rather, I am attempting to measure the likely benefits to creditors that the Debtor asks me to nullify as I weigh the competing interests presented by the Motion.

I state again that the Trustee has established that further case administration is appropriate.  The question then becomes whether the Debtor has made a compelling case that

there are equitable circumstances that the harm he would suffer outweighs the benefit that he

asks that the general unsecured creditors forego  -  that benefit being some relatively prompt,

albeit modest, payment derived from the estate.[15]

      With some reluctance, I conclude that the equities of the case tip slightly in the Debtor's

favor.

      Allowing case administration to proceed likely will be devastating to the Debtor.  The

Trustee intends to sell both the Residence and the vehicles used in the Debtor small business.

Thus, if this case proceeds, the Debtor will lose both his home and his livelihood, all due to a

filing that would never have occurred with legal proper representation.

      Granted, it is somewhat uncertain whether the Debtor can resolve his mortgage problems

and ultimately keep the Residence.  Indeed, the possibility that the Debtor will lose the

Residence in a foreclosure argues in favor of permitting the Trustee to sell the property.  But in

the current mortgage servicing climate, it would not be surprising if the Debtor and his lender are

able to come to some further forbearance arrangement or agree on a loan modification.  Further,

given the equity in the Residence, it seems likely that the Debtor would sell the Residence to

prevent losing his equity in a foreclosure sale.  In that event, the Debtor would receive funds that

allow him to address his unsecured debt outside of bankruptcy.[16]

---

[15]    I have used the terms "general unsecured creditors" in the text purposely.  In doing so, I have not overlooked the potential for full payment of the priority tax debt.  The tax creditors in this case are unsecured creditors whose interests also should be considered.  Indeed, I a chapter 7 case that results only in payment of outstanding priority tax debt is an appropriate use of the bankruptcy system.  And, I have considered the tax creditors' rights in weighing the competing interests in this case.  But I do ascribe somewhat less weight  to their interests because they have enhanced collection rights outside of bankruptcy. To some extent at least, this ameliorates the impact on them of a dismissal of the bankruptcy case.

[16]    I recognize that the sale scenario presents the potential for the Debtor to spend the sale proceeds before paying his creditors.  But, after dismissal of the case, creditors will be able to enforce their claims

Considering the uncertain state of the Debtor's relationship with his mortgage lender, if sale of the Residence were the only consequence of further case administration, as difficult as it might be for the Debtor to lose his home, I might have concluded that the interests of the creditor body outweigh the Debtor's arguably tenuous hold on the Residence.

But there is more here.  Case administration will prevent the Debtor from operating his business.  He will lose the income he needs to meet his basic living expenses.  And, the Debtor finds himself in this situation only because he filed a bankruptcy case that he should not have filed and would not have filed had he received proper representation.[17]  I also am influenced by the relatively modest level of distribution to creditors, see n.12, supra & accompanying text.

Thus, in balancing the equities here, I conclude that the harm to the Debtor in permitting the case to proceed outweighs the harm the creditors will suffer upon dismissal.  Stated differently, the benefits of permitting the Debtor to dismiss his case and attempt to resolve his financial problems outside the bankruptcy outweigh the prejudice to his creditors.

---

and obtain judgment liens against the Residence.  I acknowledge that their need to do so is a form of prejudice under §707(a).  But the issue here requires a balancing of the competing interests.

There is also an additional basis to believe that the Debtor might be able to address his existing debt outside of bankruptcy, although as the Trustee suggests, it is hardly certain.

The Debtor expects his Nevakwit income to increase.  His wife will continue to net approximately $2,000 per month.  He also has two adult children living with him who might be able to help him get back on his feet.  He described them as prospering and on a path toward financial independence though he has not asked them to contribute to the household expenses.  In fact, the Debtor acknowledged that his older son (24), just secured a reliable job as an exterminator and that his daughter will be graduating college.  He just prefers to have them unburdened by their father's financial problems, if possible.  (Audio at 1:03).

[17]   I recognize that, as a general principle, a litigant is bound by the actions of his or her attorney.  E.g., Lehman Bros. Holdings v. Gateway Funding Diversified Mortg. Servs., L.P., 785 F.3d 96, 102 (3d Cir. 2015).  But that principle has somewhat less force in the context of an equitable determination, such as the one before me, in which I must balance the potential harms to the competing parties.

## IV.

The Debtor has met his burden of showing cause to dismiss his voluntary chapter 7 bankruptcy case under §707(a).  Accordingly, I will enter an Order granting the Motion dismissing this case.

**Date:  July 14, 2022**

_____
**ERIC L. FRANK**
**U.S. BANKRUPTCY JUDGE**